UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JILLIAN KAMINSKI,

       Plaintiff,

vs.

       Case No. 12-CV-10914

       HON. GEORGE CARAM STEEH

CHILDREN'S HOSPITAL OF
MICHIGAN, et al.,

       Defendants.
_____/

OPINION AND ORDER GRANTING DEFENDANTS WAYNE
COUNTY, WAYNE COUNTY MEDICAL EXAMINER, AND ASSISTANT
WAYNE COUNTY MEDICAL EXAMINER DIAZ'S MOTION FOR
SUMMARY JUDGMENT AND/OR DISMISSAL AND REMANDING
REMAINING STATE CLAIMS TO WAYNE COUNTY CIRCUIT COURT [DOC. 42]

      Plaintiff, Jillian Kaminski, filed this action asserting federal and state claims against defendants arising out of the misidentification, transport and autopsy mistakenly performed on her son Brett Kaminski, after his death at Children's Hospital of Michigan. The matter is before the court on defendants Wayne County, the Wayne County Medical Examiner, and the Assistant Wayne County Medical Examiner Francisco Diaz's motion for summary judgment or to dismiss plaintiff's complaint. The parties appeared for oral argument on December 11, 2013. For the reasons stated below, defendants' motion for summary judgment or to dismiss is GRANTED. The remaining state claims are REMANDED to Wayne County Circuit Court.

FACTUAL BACKGROUND

On Sunday February 13, 2011, Dr. Iverson of Children's Hospital called the Wayne County Medical Examiner's Office ("MEO") to report the death of "Xavier Ramos, Hispanic/Male age 5." Ramos had died earlier at home under suspicious circumstances before being transported to Children's Hospital. The telephone report was taken by MEO Investigator Prentice and the body was ordered to the Medical Examiner's facility for autopsy.

Also on February 13, 2011, Brett Kaminski died while a patient at Children's Hospital. Children's Hospital mistakenly identified the remains of Kaminski as that of Xavier Ramos. Kaminski's remains were then delivered to the MEO by Professional Removal Service (PRS) employees James Pollard and Dionne Moore. The medical records and pre-mortem studies of patient Ramos accompanied the body of Kaminski. These items had been provided by Children's Hospital morgue security personnel to Professional Removal Service personnel at the time of pick-up. In addition, a Morgue-Body Receipt card for Ramos, completed by PRS staff, and signed by PRS employee Pollard and hospital security officer Burris, accompanied the body of Kaminski.

Kaminski did not die under suspicious circumstances, and his death was not reported to the MEO. However, Kaminski's remains were logged into the MEO by Wayne County Investigator Richard Ivy as "Xavier Ramos." Ivy then completed a toe tag with the Ramos information obtained from the Body Receipt Card that he received from the PRS employees. Photographs produced in discovery show that there are two toe tags on Kaminski's toe. The one in front is the ME's tag, which has the name

"Xavier Ramos". The other tag, which was likely obscured by the larger ME tag, appears to be a hospital tag and reads "Brett Kaminski".

On Monday morning, February 14, 2011, an autopsy was performed on Kaminski's remains by Assistant Wayne County Medical Examiner Dr. Francisco Diaz, who believed it to be the body of Xavier Ramos. Diaz listed the cause and manner of death as "pending." That afternoon, someone from Children's Hospital called MEO Investigator Val Knight to inform him that the hospital had given the removal service the wrong body. Investigator Knight initiated an investigation into the error.

Dr. Diaz called Kaminski's treating physician at Children's Hospital, Dr. Tremonti, and discussed his post-mortem findings. Dr. Tremonti stated she would sign the death certificate, which had not yet been done, and speak with the family as she had a long relationship with them.

Dr. Diaz testified that he did not specifically remember this case, but he always checks the toe tag before he does an autopsy. He believes that the two toe tags must have been overlapping such that he did not see the one that was covered. If he had seen two tags with different names, he would have stopped and made further inquiry. (Diaz dep. 12-15).

PRS employees Moore and Pollard were interviewed by their boss, Eric Orr, and admitted they had failed to make an accurate confirmation between the case number given and the case number on the remains prior to delivering it to the MEO. They testified that the wrong remains had been placed in a disaster pouch containing the name Ramos and case number assigned to Ramos. Further, the medical records and

-3-

x-rays of Ramos were given to these PRS employees by Children's Hospital security personnel, who released the body as that of Ramos.

On October 24, 2012, plaintiff filed her First Amended Complaint containing 19 counts. The claims against Wayne County, the Wayne County Medical Examiner, and the Assistant Wayne County Medical Examiner Dr. Diaz are: deprivation of a protected property right under 42 U.S.C. § 1983; intentional infliction of emotional distress; and 14th Amendment denial of procedural due process for depriving plaintiff of a constitutionally protected property interest in her deceased son's body for the purpose of burial. In addition, plaintiff alleges a claim of gross negligence against Dr. Diaz.[1]

## STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

---

[1] Claims which are part of the complaint but not the subject of the pending motion include those against Children's Hospital of Michigan: negligence, negligent infliction of emotional distress, intentional infliction of emotional distress. Claims against Professional Removal Service: negligence and negligent infliction of emotional distress. Claims against James Pollard: negligence and negligent infliction of emotional distress. Claims against Dionne Moore: negligence and negligent infliction of emotional distress.

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252.  Rather, there must be evidence on which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (*citing Anderson*, 477 U.S. at 252).

## **RULE 12(b)(6) DISMISSAL STANDARD**

Rule 12(b)(6) allows the Court to make an assessment as to whether the plaintiff has stated a claim upon which relief may be granted.  Under the Supreme Court's articulation of the Rule 12(b)(6) standard in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554-56 (2007), the Court must construe the complaint in favor of the plaintiff, accept the allegations of the complaint as true, and determine whether plaintiff's factual allegations present plausible claims.  "[N]aked assertions devoid of further factual enhancement" are insufficient to "state a claim to relief that is plausible on its face". *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  To survive a Rule 12(b)(6) motion for dismiss, plaintiff's pleading for relief must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007) (*quoting Bell Atlantic*, 550 U.S. at 555) (citations and quotations omitted).  Even though the complaint need not contain "detailed" factual allegations, its "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true." *Id.* (*citing Bell Atlantic*, 550 U.S. at 555).

## ANALYSIS

**I. Protected Property Interest - 28 U.S.C. § 1983 and Fourteenth Amendment**

Plaintiff is the parent with sole legal custody of the deceased minor, Brett Kaminski.  Plaintiff maintains that she has a constitutionally protected property right in the body of her son, for the purpose of burial.  Defendants are accused of interfering with plaintiff's property interest by holding the body of Brett Kaminski for 24 hours and performing an unnecessary autopsy which resulted in cutting and dissecting the body, and removing organs including the brain.

Plaintiff's federal constitutional due process claim, brought against the state actors pursuant to 42 U.S.C. § 1983, depends on her having a property interest in the decedent's remains. To establish a due process claim, plaintiff must allege "(1) [s]he had a life, liberty, or property interest protected by the Due Process Clause; (2) [s]he was deprived of this protected interest; and (3) the [government] did not afford [her] adequate procedural rights prior to depriving [her] of the property interest." *Waeschle v. Dragovic*, 576 F.3d 539, 544 (6th Cir. 2009) (internal citations omitted). Property interests "are defined by existing rules or understandings that stem from independent sources such as state law rules." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972).

There are several Michigan cases that discuss the general right of next-of-kin to the body of a deceased for burial. In a case brought against hospital personnel, the Michigan Supreme Court held that next-of-kin are "entitled to possession of the body as it is when death comes, and that it is an actionable wrong for another to interfere with that right by withholding the body or mutilating it in any way." *Doxtator v. Chicago & W. Mich. R.R.*, 120 Mich. 596 (1899). In a replevin action seeking return of a body from undertakers who sought to hold the body until they were paid for their services, the court recognized a right to have the body delivered for burial without mutilation, referring to decomposition. *Keyes v. Konkel*, 119 Mich. 550 (1899). In *Deeq v. City of Detroit*, 345 Mich. 371 (1956), organs were removed by the coroner at the request of the city's medical representative, for purposes of determining the presence or absence of alcohol, which would be relevant to the issue of liability for an accident. Where the medical examiner did not deem such action necessary, the court recognized a cause of action

for next-of-kin where decedent's body was mutilated during an autopsy performed without lawful authority.

The Sixth Circuit looked at Michigan case law in the case of *Whaley v. County of Tuscola*, 58 F.3d 1111 (6th Cir. 1995). Next-of-kin asserted Fourteenth Amendment procedural due process violations where the county medical examiner's assistant harvested eyes and corneas during autopsies, without permission, to sell for personal profit in his private business, an eye bank and tissue center. The court stated that "Michigan common law clearly holds that the next of kin have the right to possess the body for burial." *Id*. at 1116. The court also relied on the statute governing county medical examiners, which provides that the medical examiner shall promptly return the body to relatives of the deceased after any required autopsy. M.C.L. § 52.205(5).[2] The court thus found that Michigan law provides next-of-kin with a quasi-property interest in a dead relative's body, including the eyes, for purposes of burial, and that the next-of-kin could bring a constitutional claim under the Due Process Clause. *Id.* at 1117.

The Michigan Supreme Court considered the rights of next-of-kin in a certified question arising out of a case pending in the Eastern District of Michigan. *In re Certified Question From the U.S. District Court for Eastern District of Michigan (Waeschle v. Oakland Co. Med. Examiner)*, 488 Mich. 1 (2010). The court held, "[a]ssuming that a decedent's brain was removed by a medical examiner to conduct a lawful investigation into the decedent's cause of death, the decedent's next of kin does not have a right under Michigan law to possess the brain in order to properly bury or cremate the same

---

[2] M.C.L. § 52.205(5) was amended effective July 1, 2010 and is discussed further below.

after the brain is no longer needed for forensic examination." The case looked at MCL 52.205(5) prior to its amendment in 2010, when the section required the county medical examiner to "promptly deliver or return the body to relatives . . . except that the medical examiner may retain, as long as may be necessary, any portion of the body believed by the medical examiner to be necessary for the detection of any crime." The court held that because the statute required only prompt return of the body, and because it permitted the medical examiner to retain portions of the body in order to detect crime, the law provided next of kin no clear right to the return of a brain lawfully removed and retained for forensic examination after the body was returned to the decedent's family for burial. *Id.* at 3-4.

In 2010 section 52.205 was amended to require that the medical examiner promptly return the body or any portion of the body to relatives of the decedent after an examination or autopsy is performed under the statute. The medical examiner may retain any portion of the body he or she considers necessary to establish the cause of death. The amendment addresses the duty to notify family if body parts are retained, and the duty to inform the family they have the right to request those parts be returned once they are no longer needed by the medical examiner. M.C.L. § 52.205(6).

The amendment of MCL § 52.205 does not change the holding of *In re Certified Question*, nor does it create a property interest, in any way that is relevant to this case. The law in Michigan requires the county medical examiner to perform an autopsy to investigate the cause and manner of death where the decedent did not receive medical attention during the 48 hour period prior to death, unless the attending physician, if any, is able to determine the cause of death. MCL 52.202. As long as an autopsy is

performed pursuant to legal authority, any mutilation caused by the autopsy, or withholding of any body parts for legitimate reasons, is not a violation of the right to possession of the body for burial.

In this case, since Brett Kaminski's body was conveyed to the morgue and identified as Ramos, a child who died at home without attendant medical care, and the Ramos medical records confirmed this fact, and no death certificate had been issued or signed by the attending physician determining a cause of death, Dr. Diaz had statutory authority to autopsy the body pursuant to MCL 52.203. The autopsy was done promptly, and the body was returned for burial without delay.

Without a violation of a constitutional property interest, plaintiff's Due Process claim brought against Dr. Diaz under 42 U.S.C. § 1983 is dismissed. Even assuming that Dr. Diaz had a duty to return the body to plaintiff without "mutilation" caused by the autopsy, the doctrine of qualified immunity requires both a subjective and objective intent to act in derogation of plaintiff's rights in order for her to state a constitutional violation. The court finds that it is impossible for plaintiff to state such a constitutional claim here where it is undisputed that the body was promptly returned for burial and there is no evidence to support a finding that Dr. Diaz intended to violate plaintiff's constitutional rights.[3]

## II. Unconstitutional Policy or Custom of Wayne County

For Wayne County to be liable under 42 U.S.C. § 1983, for either the deprivation of a protected property interest or violation of procedural due process, plaintiff must

---

[3] The issue of qualified immunity is discussed further in section III.D. below.

show that the alleged injuries were inflicted pursuant to a governmental custom, policy or practice. Plaintiff must identify the policy, and connect the injury to the execution of the policy by the county. *Graham v. County of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004); *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978). Plaintiff's complaint focuses on the events surrounding the mistaken delivery of the remains of Brett Kaminski to the morgue. However, there is no identification of a county policy that is alleged to have been the moving force behind the alleged constitutional violation. This appears to be a single incident of negligence, which is insufficient to establish liability under § 1983.

Wayne County has clear policies governing the handling of the bodies at the Medical Examiner's office. Investigators are required to conduct an independent identity verification, following a procedure for logging in bodies, toe tagging, weighing and other duties. At 8:00 a.m., the bodies are to be "rolled out" en masse. When the ME enters the room, there are several bodies that have been prepped by others for exam. The ME, Dr. Diaz in this case, looks at the bodies, reviews the records, and performs the autopsy. Plaintiff's unconstitutional custom or policy claim is dismissed for failure to identify a custom or policy amounting to a violation of a constitutional right.

Plaintiff additionally argues a failure to supervise or train employees. Plaintiff cites to the Medical Examiner statute, MCL 52.205(4), to support a duty of the ME to confirm the identity of a body received for autopsy. Plaintiff argues that Investigator Richard Ivy failed to identify the body of Kaminski, by ensuring that he had the correct remains. Had he done so, an autopsy would not have been done on the wrong body. However, subsection (4) applies to unidentified John Doe bodies presented to the

morgue. In this case, the identification had already (albeit mistakenly) been made by the hospital and PRS personnel. The statute itself was not violated in this case.

Finally, where there is no constitutional violation by an individual defendant, there is no liability against the municipality.

### III. Immunity

#### A. Governmental Immunity from Tort Liability

State and local government agencies are statutorily immune from state law tort liability for injuries arising out of the exercise or discharge of a non-proprietary governmental function. *Ross v. Consumers Power Co.*, 420 Mich. 567, 591 (1984); M.C.L.A. § 691.1407. A "governmental function" has been defined by common law as "any activity which is expressly or impliedly mandated or authorized by constitution, statute or other law." *Id.* at 617-21. When a governmental agency engages in such an activity, it is immune from tort liability unless the activity is proprietary in nature or falls within one of the other statutory exceptions. *Id.* at 620.

The office of the county medical examiner is authorized by law pursuant to M.C.L.A. 52.201. See *Burse v. Wayne County Medical Examiner*, 151 Mich. App. 761, 765 (1986). Section 52.202(1)(c) provides that the county medical examiner shall investigate the cause and manner of death of an individual where the individual dies without medical attendance by a physician during the 48 hours immediately preceding the time of death, unless the attending physician, if any, is able to determine accurately the cause of death. Therefore, the operation of the Wayne County Medical Examiner's office is a governmental function, and there is no allegation that the office falls within one of the statutory exceptions to immunity.

The court must look to the language and interpretation of section 691.1407(1), which provides:

> Except as otherwise provided in this act, a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function. Except as otherwise provided in this act, this act does not modify or restrict the immunity of the state from tort liability as it existed before July 1, 1965, which immunity is affirmed.

Exceptions to governmental immunity are to be narrowly construed. *Glancy v. Roseville*, 457 Mich. 580 (1998); *Sewell v. Southfield Public Schools*, 456 Mich. 670, 674 (1998). Examples of recognized exceptions to governmental immunity for tort liability include the public building exception at M.C.L.A. § 691.1406, and the highway exception at M.C.L.A. § 691.1402(1). See, *Id.*

In this case, plaintiff argues that there is no immunity because defendants acted outside the scope of their duty. While the defendants in this case were acting under the mistaken belief that the body being presented for autopsy was that of Xavier Ramos, there is no indication that any of them purposely misidentified the body so that the autopsy would be performed on the wrong person. Defendant Wayne County is entitled to immunity on the state tort claim of intentional infliction of emotional distress.

**B. Individual Immunity from Intentional Torts**

To evaluate immunity for intentional torts by individuals, the court must determine whether (1) the acts were undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority; (2) the acts were undertaken in good faith, and (3) the acts were discretionary, as opposed to ministerial. *Odom v. Wayne County*, 482 Mich. 459, 470

(2008). The good faith element protects a defendant's honest belief and good faith conduct with a cloak of immunity while exposing to liability a defendant who acts with malicious intent. *Odom*, 482 Mich. at 482. For this protection, the employee must have acted during the course of employment, within the scope of his or her authority, and not with malice. *Id.* at 480. A lack of good faith for immunity does not require specific intent; a lack of good faith may be shown by "a wanton or reckless disregard of the rights of another." *Id.* at 474.

Plaintiff cites cases in which the individual actor knew enough about a situation to foresee that possibility of harm, and consciously took a risk. See *Haverbush v. Powelson*, 111 Mich. App. 228, 236-37 (1996); *Turner v. Nichols*, 2010 WL 4968073 (Mich. App. 2010) (failure to send medical assistance in response to 911 call made by child seeking help for mother). However, in this case, a reasonable juror could not find that Dr. Diaz was aware of the risk that his conduct in performing an autopsy on Brett Kaminski would cause emotional distress to the plaintiff and acted in disregard of that risk because Dr. Diaz *did not reasonably foresee that harm*. He testified he never saw two toe tags, and if he had he never would have performed the autopsy. Rather, Dr. Diaz never appreciated the risk of mistaken autopsy due to his reliance on the legal responsibilities of the hospital and delivery service to properly identify the body prior to delivering it to the morgue.

Dr. Diaz had a statutory duty to perform an autopsy on the body identified as Ramos because the decedent did not receive medical attendance within 48 hours prior to death. MCL 52.202. Dr. Tremonti had not signed the death certificate for Brett Kaminski at the time of the autopsy. The cause and manner of death had not been

determined at the time of autopsy. The duty of autopsy is one owed to the State, not to the relatives of the deceased. *Maiden v. Rozwood*, 461 Mich. 109 (1999).

Dr. Diaz performed the autopsy in question during the course of his employment, reasonably believing that he was acting within the scope of his authority, while acting in good faith, and the autopsy was reasonably determined to be required under statute. *Ross*, 420 Mich. at 633-34. Dr. Diaz is immune from intentional tort liability, in this case being intentional infliction of emotional distress.

### C. Gross Negligence

The Governmental Tort Liability Act has an exception to the broad grant of immunity for specific actions of governmental employees that rise to the level of gross negligence. MCL 691.1407(2) provides that an employee of a governmental agency acting within the scope of his or her authority is immune from tort liability unless the employee's conduct amounts to gross negligence that is the proximate cause of the injury. *Kendricks v. Rohfield*, 270 Mich. App. 679, 682 (2006). Gross negligence is defined as "conduct so reckless as to demonstrate a substantial lack of concern of whether an injury results." "Evidence of ordinary negligence is not enough to establish a material question of fact regarding whether a government employee was grossly negligent." *Chelsea Inv. Group LLC. v. Chelsea*, 288 Mich. App. 239, 265 (2010).

Dr. Diaz was the board certified forensic pathologist who performed the autopsy on the Kaminski child. He reviewed a typed docket list of names to be autopsied that day, which listed the name Ramos. He reviewed the histories of each of the bodies as provided by the hospitals and determined which bodies needed full autopsies versus external exams. He specifically reviewed the Ramos medical records that Children's

Hospital and the removal service delivered with the body. This review did not provide any information from which he could detect a problem with the mistaken child's body prior to conducting the autopsy.

Dr. Diaz testified why a look at the bodies and the medical records would not necessarily reveal a difference between nine year old Brett Kaminski and five year old Xavier Ramos. Diaz explained that Ramos had a trisomy, which is a severe congenital malformation. Kaminski had cancer, including surgery scars, a medical device in his head for medication, and a bald head. Diaz testified that due to their conditions, he would expect to see evidence of treatment in both bodies. He described the mix-up as "bad serendipity" because nothing stood out as wrong or unusual upon a visual inspection of the body before him.

Diaz admitted that photographs produced at his deposition showed two toe tags on the foot of Brett Kaminski, with two different names. The larger tag was visible over the smaller tag, and it had the name Ramos on it. Diaz testified that if he had seen two tags with two different names, he would have stopped and not done the autopsy until he could do some further inquiry.

At the time of the autopsy, Diaz had no death certificate for either Kaminski or Ramos. It was not until after the autopsy was performed that Dr. Tremonti contacted Diaz to report that the hospital erred and offered to sign the death certificate to expedite the body's release for burial. All Dr. Diaz had before him was the Ramos medical records which showed no physician involvement prior to death, a child who died at home, and a body identified with a large toe tag with "Ramos" in it.

Where a physician performs an autopsy upon a dead body under legal authority, with ordinary skill and care, he or she will not be liable to the family of the deceased for the mutilation of the body without their consent. No reasonable juror could conclude that Dr. Diaz was grossly negligent under the facts in this case.

**D. Qualified Immunity**

In order to defeat Dr. Diaz's claim of qualified immunity, plaintiff must demonstrate that she had a clearly established constitutional right to the decedent's body that was violated by the acts of Dr. Diaz. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). In this case, Michigan statutory and case law does not establish a clear constitutional right in a parent to her child's body that is violated by an autopsy being mistakenly performed by a county medical examiner. The most that can be said in this case is that Dr. Diaz was negligent for not moving a toe tag that obscured the one underneath, but negligence is not enough to remove the protection of qualified immunity.

There is not a claim for negligently undertaking to perform an autopsy. In order to avoid qualified immunity, Dr. Diaz's actions must have been willful and wanton, or undertaken for malicious purposes. Here it is undisputed by any evidence at all that Dr. Diaz and all of the state actors undertook the autopsy because of a mistaken belief that the body of Kaminski was that of Ramos. These actors not only had the authority, but the duty, to undertake the autopsy.

Had Dr. Diaz knowingly performed the autopsy on the wrong body for his own gain, or for other scurrilous reasons, the protection of qualified immunity might not apply, but that is obviously not this case. Just as in the case where a police officer

shoots and kills a person he mistakenly thinks is reaching for a gun, the individual actors in this case made simple, good faith mistakes in processing an autopsy they believed was required by their duties.

Dr. Diaz is protected by qualified immunity from plaintiff's claims of deprivation of a personal property interest and violation of procedural due process.

## IV.  Wayne County Medical Examiner

The office of the Wayne County Medical Examiner is a government department, and as such is not a separate legal entity subject to suit under § 1983.  Therefore, defendant Wayne County Medical Examiner, named in counts 7, 8 and 9 of the complaint, is dismissed from this lawsuit.

## V.  Remand State Claims

28 U.S.C. §1367(c)  provides the court may decline to exercise supplemental jurisdiction over a claim when: "(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction."  By entry of this order, the court is dismissing all federal claims over which it has original jurisdiction, leaving only state tort claims alleging negligence and the negligent or intentional infliction of emotional distress against the remaining defendants.  After considering "the values of judicial economy, convenience, fairness, and comity", Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988), this court declines to exercise supplemental jurisdiction over plaintiffs' state law claims.  The court therefore REMANDS plaintiffs' claims against Children's Hospital of

Michigan, Professional Removal Services, James Pollard, and Dionne Moore to Wayne County Circuit Court.

## CONCLUSION

For the reasons stated in this opinion and order, the motion for summary judgment and/or dismissal filed by defendants Wayne County, Wayne County Medical Examiner and Assistant Wayne County Medical Examiner Diaz is GRANTED. Counts 4 through 13 of the plaintiff's complaint are DISMISSED. The remaining counts, all of which allege state claims against Children's Hospital of Michigan, PRS and the individual defendants, are REMANDED to Wayne County Circuit Court. In accordance with this remand, the hearing on PRS's motion for summary judgment [doc. 45], scheduled for January 22, 2014, is cancelled.

Dated: January 15, 2014

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
January 15, 2014, by electronic and/or ordinary mail.

s/Barbara Radke
Deputy Clerk

---